[No. 1902.]

TOM KENNEDY *v.* THE STATE.

1. PRACTICE — SUBSTITUTION OF LOST PAPERS.— Without denying the issuance, service and return at the proper time of a necessary process in the case, which was subsequently lost, the defendant objected to the sufficiency of a purported substitute made out by the clerk and sheriff of their own motion, and asked the court to hear proof as to the validity of the substituted paper. The court complied, and held, upon the evidence, that the statutory writ was, at the proper time, issued, served and returned, and was subsequently lost. *Held,* that, failing to move the court to strike out the substitute and require the State to substitute the lost paper in the statutory manner, and securing the relief for which he asked, the defendant cannot be heard to complain.

2. SAME — JURY LAW.— To the general rule that the trial court cannot excuse a *venireman* from service on the jury until he appears in person and an-

swers to the call of the *venire,* is placed in the box, and is sworn to answer
under oath all questions touching his qualifications, an exception obtains
when the reason of the rule fails. A postmaster is an officer in the civil
service of the United States within the purview of article 3014 of the Re-
vised Statutes, which exempts from jury service, if they claim exemption,
all civil officers of this State and of the United States. A postmaster was
summoned on the special *venire* in this case, claimed his exemption and
sent his excuse by the sheriff, and was excused by the court over the defend-
ant's objection.  *Held,* that, failing to apply for an attachment to en-
force the attendance of the *venireman* and test the *bona fides* of his excuse,
the defendant did not exhaust his remedy, and cannot be heard to com-
plain.

3. SAME — CHALLENGE FOR CAUSE. — The act of the Nineteenth Legislature
(General Laws, subdivision 13, page 91) provides as follows: "If it (the
opinion of the proposed juror) appears to have been formed from reading
newspaper accounts, communications, statements or reports, or from mere
rumor or hearsay, and the juror states on oath that he feels able, notwith-
standing such opinion, to render an impartial verdict upon the law and the
evidence, the court, if satisfied that he is impartial and will render such
verdict, may, in its discretion, admit him as competent to serve in such
case ; but if the court in its discretion is not satisfied that he is impartial,
the juror shall be discharged." The proposed jurors in this case having
stated upon their *voir dire* that, notwithstanding their previously so formed
opinions, they were impartial and could fairly try the defendant, uninflu-
enced by their opinions, the court, in holding them competent upon chal-
lenge for cause, did not abuse its discretion.

4. SAME. — EXEMPTION from jury service upon the ground that the juror is a
civil officer of the State or of the United States is a personal privilege to be
claimed or waived by the juror himself, and it is not within the power of
the defense to save a peremptory challenge by insisting that a juror coming
within the exemption shall claim it.

5. SAME. — A juror who thinks "a life term in the penitentiary bad enough for
anybody," and has conscientious scruples against the infliction of capital
punishment, is subject to the State's challenge for cause in a capital case,
and if so challenged, his rejection is proper.

6. PRACTICE — BILL OF EXCEPTIONS. — While it is error for the trial court to
refuse the defendant time to prepare his bills of exception, whether he has
one or more counsel, such refusal is not, of itself, such error as will, in the
absence of a showing of prejudice, authorize a reversal of the judgment.
The rule is that error without prejudice is rarely reversible error.

7. SAME. — BILL OF EXCEPTIONS to the refusal of the court to give time for the
preparation of bills of exceptions, to raise the error complained of, should
disclose the bill to which the defendant claimed he was entitled and of
which he was deprived, or must show some other material injury to which
he was subjected by the refusal. The bill in this case recites merely the
fact that the trial court refused time to prepare bills, and does not, even in
general terms, allege that injury was the result of the refusal. *Held,* that
the bill is insufficient to raise a reversible error.

8. SAME — JURY LAW. — A juror having qualified himself on his *voir dire* was
accepted by the State, but the defendant having exhausted his peremptory
challenges declined to accept or reject the juror, and the court ordered the
juror to be sworn and impaneled. *Held,* correct. Challenges for cause are

unlimited, and if cause existed it was available to the defendant after the exhaustion of his peremptory challenges.

9. SAME — EVIDENCE.— Whatever is said by any of the parties to a transaction at the time of the transaction is a part of the transaction itself, and is admissible in evidence as a part of the *res gestæ*. Under this rule a State's witness was properly permitted to testify that, just after the fatal shot was fired, he heard the accused's co-defendant exclaim: "Oh yes, boys, I got him this time!"

10. SAME — THE "RULE."— As a general rule all matters pertaining to the sesquetration of witnesses are committed to the discretion of the trial court, and while the practice of permitting counsel to confer with witnesses under the rule is condemned, still this court will interfere because of such practice only when an abuse of discretion is made manifest.

11. SAME.— LEADING QUESTIONS are such as suggest the answer desired. A question to be answered "yes" or "no," and which suggests no more the affirmative than the negative, is not a leading question. See the opinion *in extenso* for an example.

12. SAME — "OPINION." — A witness having described the peculiar formation of the hind feet of a certain mule was asked by the State if that mule made a certain track which he testified that he trailed after the homicide. The defense objected that the question called for the mere conclusion or opinion of the witness. But *held*, that the witness having described the peculiarity of the mule's feet and track, the proof sought to be made was of a fact as contradistinguished from a conclusion or opinion.

13. SAME.— The trial court did not err in permitting a witness to testify that the first parties who reached the dead body attempted to prevent the obliteration of tracks leading to and from the place of the homicide, by warning and requesting other parties approaching to keep away.

14. SAME.— Proof of what parties, distant from the place of the homicide, said to each other when they heard the firing of the guns supposed to have killed the deceased, was properly excluded as *res inter alios acta*.

15. SAME — DECLARATIONS OF A CO-DEFENDANT — CONSPIRACY.— A witness was permitted to testify, over the objection of the defendant, that one T., a co-defendant of the accused, some days before the homicide, when the accused was not present, told the witness that he and the accused "were going to kill (the deceased) the first chance they got, and were going for him any time." *Held*, correct; for, though a conspiracy between the parties may not have been conclusively established before this testimony was admitted, it was established on the trial, and this testimony tended to establish its existence at the time the statement was made.

16. SAME.— The pendency in a justice's court of litigation between the families of the deceased and the defendant could as well be proved by the testimony of the justice of the peace as by his court record.

17. PRACTICE — PRIVILEGE OF COUNSEL.— Public opinion being subordinate to the law of the land should have nothing whatever to do with trials in the courts of justice, and should not, therefore, be invoked in appeals to the jury. It was proper, therefore, for the trial judge, when the district attorney began to speak, in his argument to the jury, of "public opinion," to instruct the attorney to refrain from any allusion to public opinion.

18. SAME.— While the strict rule of practice condemns in counsel for the State or the defendant an expression of opinion in argument as to the guilt or innocence of the accused, still a mere violation of the rule is not of itself

cause for reversal. But in any event the violation of the rule would be immaterial on appeal in the absence of a requested instruction to the jury to disregard the attorney's individual opinion.

19. Murder — Fact Case.— For evidence sufficient to support a conviction for murder of the first degree, see the statement of the case, and the statement of the facts proved in *Thompson's* case, *ante,* p. 593.

Appeal from the District Court of Van Zandt. Tried below before the Hon. F. J. McCord.

The appellant in this case, a severance from his co-defendants, Iven Thompson and Scott Hendricks, having been awarded, was tried upon an indictment which charged him, jointly with his co-defendants, with the murder of Edmond Hill, in Van Zandt county, Texas, on the 17th day of August, 1883. He was convicted of murder in the first degree, and his punishment was assessed at a life term in the penitentiary.

The inculpatory evidence upon which this conviction was had is derived principally from witnesses who testified upon the trial of Iven Thompson. As the evidence is fully reported in that case (*ante,* p. 593), the testimony of the several witnesses will be noticed in this report only as it varies materially from their statements upon that trial. The witnesses Beall, Caldwell, Thompson, Tumlinson, Gilchrist and Lafton, who testified in Thompson's case, did not testify in this case. The testimony of witnesses who testified in this case and did not testify in Thompson's is fully disclosed below, except where it is merely corroborative of the criminative evidence in Thompson's case.

Ike Russell, the first witness for the State, testified substantially as he did upon Thompson's trial, except that upon this trial he deposed that when he and Joe Taylor, *en route* from Frank Clemmons's house to Melissa Hill's, after the homicide, met the defendant and Scott Hendricks, the defendant was riding his large sorrel mule under a man's saddle, and Hendricks defendant's small black mule under a woman's saddle. Defendant and Hendricks, who were then traveling the road to Hopewell church, asked Taylor if he was not going to the big baptizing. Taylor replied that he was not, and the parties passed on, but at a short distance stopped and looked back at witness and Taylor. On his cross-examination he stated that the right side of his face was scorched by the shots which killed the deceased. He did not tell Frank Clemmons or Joe Taylor that the voice he heard just after the shots were fired was the voice of Scott Hendricks, nor did he tell any one until he told de-

ceased's wife on his arrival at her house. The witness admitted that, a few days after the killing and at the last term of court, he told the attorneys for the defense, in the office of one of them, that the voice he heard after the shooting was the voice of Iven Thompson, but he was then frightened, and was locked in the office, and was talked to in such a loud and peremptory manner by the lawyers that he did not know what was likely to be done to him. Witness testified on the examining trial, on Saturday, the next day after the killing, that he and Monroe Hill tracked the mule and a man from the place of the killing to defendant's house.

Lizzie Perry testified, for the State, that she lived on the road leading from defendant's house to Green's mill, and about two hundred yards from defendant's house. She knew that the defendant owned two mules, one a large sorrel, and the other a small black or brown. Riley Turner passed the witness's house, going to mill, about thirty minutes after sunrise on the morning of the killing, riding the defendant's black mule. Defendant, riding his big sorrel mule, passed the witness's house about 9 o'clock on that morning. Witness heard of Hill's death about one hour after he was killed, and subsequently showed Joe Taylor and Jim Anderson where the defendant passed along the road by her house.

Cross-examined, the witness said that her nephew, John Henry Manley, told her of the killing about 11 o'clock on the 17th day of August, 1883. Defendant was in the habit of passing the witness's house, but had not been by there recently. The witness knew of no particular reason why she noticed defendant as he passed on that morning. Joe Taylor, Al. Hill and Ike Runnells passed her house on the same day about noon, going to the place of the killing, which was the same direction traveled by defendant when he passed on that morning. Witness did not observe the defendant's dress on that morning.

Joe Taylor testified for the State substantially as he did in Thompson's case, except that on this trial he repeated, about as Ike Runnells did, the few words that passed between him and defendant when they met, after the killing, in the Neches bottom at the Adrian crossing of the river.

Monroe Hill testified, for the State, that he was the son of the deceased. Witness was in Smith county at the time of the homicide, but got home that night. Witness was at Edom on Saturday, the day after the killing. The wives of the defendant and Thompson had been prosecuted in that court for an assault on the witness's sister. On the Sunday morning after the killing the witness and

Ike Runnells went to the place of the killing and took up the track of three men, which they followed. The witness described the tracks and the trail from the body to defendant's gate substantially as Ike Runnells did on this and the trial of Thompson. At Dack Manley's house, about ten days before the homicide, Iven Thompson told the witness that he, Thompson, and the deceased could not live in the same country together; that he had put men under the ground before, and that he had a pistol then. Scott Hendricks said that a scandal about himself and Cassie Williams was in circulation, and that the deceased was to blame for it. The feeling between the deceased and the parties charged with his murder was very unfriendly.

Jim Hines was the next witness for the State. He corroborated the testimony of the witness Beall in Thompson's case as to his and Beall's expedition into Smith county on the Monday after the homicide. He described the tracks of the men at the point of the killing, and the track of the mule found near it, substantially as did other witnesses in the two cases, and stated that he knew of no mule in the neighborhood, save the large sorrel mule of the defendant, which could have made a track similar to that found near the place of the killing. On Sunday evening after the killing, the witness fell in with a party and followed the mule track as it went from a point near the defendant's house to the point about two hundred yards from the killing where the mule was hitched on the day of the killing. The witness was at church when the killing occurred, but heard of it about 11 o'clock and went to the body with Mr. Green and Mr. Ford. They found the tracks so often described, and the gun wadding as described by the witnesses on Thompson's trial. One of three men, as disclosed by tracks, wadding, etc., was ambushed in a hickory tree top screened with briars and bushes; the second was ambushed behind a black jack tree, five or six steps from the tree top, and the third man was hidden behind a cluster of bushes six or seven steps from the black jack tree. Witness saw the hat of the deceased lying in the road near the point where he was said to have received his fatal wound, and gun wadding was scattered from that point to the tree top. Witness saw Iven Thompson in jail at Tyler after his arrest, and noticed that he wore a number ten or eleven brogan shoe, run out and down at the heels.

Cross-examined, the witness said that six or seven years before this trial he had a reel-footed mule, which he traded to Willis Manley. Witness had not seen that mule for two or three years prior to the killing. That mule did not make the track followed by witness to and from the place of the killing.

Alex. Wheat testified, for the State, that he was in the woods with Jim Anderson splitting rails when the killing occurred. They were about a mile and a half from the place where deceased was killed. Witness heard three shots, two from a shot-gun, and one from a pistol. Witness, about a week before the killing, traveled home from Tyler in company with the defendant and Jim Anderson, and heard the defendant, on that trip, say that Edmond Hill must die before the next term of the court at Edom. On another occasion, about three weeks before the killing, whiile the case against the wives of the defendant and Iven Thompson was in progress, witness heard defendant say to the deceased: "Such old devils as you ought to be killed." The deceased retorted with a like remark.

Cross-examined, the witness said that defendant and Anderson left Tyler in the morning of the day he heard the defendant make the remark stated, and before he did, but that he caught up with them before they reached Wilson's place. The remark quoted was the first thing witness heard said when he overtook the parties. Peter Hill was at Edom, and heard the defendant tell deceased that such old devils as he ought to be killed.

Jim Anderson was the next witness for the State. He corroborated the witness Wheat as to what defendant said about the deceased on the way home from Tyler. He repeated also the conversation between defendant and Thompson on the log in the rear of Thompson's house as stated by him on the Thompson trial, and stated, in addition, that on that occasion the defendant asked him why he had indicted Iven Thompson, and he replied that the deceased, and not he, was the man who had done it. Witness heard Thompson, on the day after the trial at Edom, say that he was going to kill deceased.

Cross-examined, the witness said that he was cutting rails in the bottom when the killing occurred, but did not hear the fatal shots, though Alex. Wheat said that he did. The defendant said, on the way from Tyler, after Wheat overtook him and witness: "We are going to kill Edmond Hill."

Jack Williams and Dack Manley testified for the State substantially as they did on the trial of Thompson.

John Cauthorn testified, for the State, that he was the justice of the peace of the Edom beat in August, 1883. He held court on the Fridays before the fourth Saturdays in each month. His recollection was that, at the time of the killing, there were some cases on his docket in which the families of the deceased and defendant were involved. The State closed.

Constable Fayette Raines was the defendant's first witness. He

testified that, on the Friday night of the killing, he went to the defendant's house in search of Iven Thompson. Defendant furnished a light and aided witness in his fruitless search for Thompson. The witness, without a warrant, took the defendant that night to J. Y. Green's house, arriving there about 12 o'clock. Mr. Green got up, looked at defendant's foot, and had defendant make a track. He examined the track, and said that it was not the track he measured and followed. Defendant went willingly with the witness and made no effort to escape, although he was left alone on the gallery once, when the guard in whose charge witness left him stepped off some sixty steps to feed a horse. Witness did not know who made the complaint against defendant, but thought Jim Anderson did. At all events, the deceased told witness that he had Jim Anderson to make it, " to clear his skirts." The trial was to come off at the August term of the court. Defendant's and Iven Thompson's wives were under complaint for disturbing the peace, and at the July term had been acquitted of an assault upon Cora Hill, the complaint in which case was made by Cora Hill. Defendant declined to sign the appearance bond of Thompson's wife. Thompson was dodging a warrant in witness's hands for some time prior to the killing. Witness could hear of him in the county, but failed to find him.

Henry Kennedy, the brother of the defendant, testified for the defense that he lived at his father's house, in sight of, and in speaking distance of, defendant's house. Scott Hendricks came to defendant's house on the morning of the homicide, about sunrise, to bring the Kennedy horses which had broken into his field on the night before. He came again about 9 o'clock, and, in the hearing of the witness, asked the defendant, who was sitting on his gallery, if that mule had been brought back yet. Defendant replied that it had not. Witness and Cassie Williams then went on to the Hopewell church, leaving defendant sitting on his gallery. He saw defendant and Scott at the Hopewell church on that day. Cassie Williams rode her own side-saddle. Defendant's wife owned a side-saddle. Witness and his two brothers helped to dig the grave and bury the deceased. Scott Hendricks rode Tom's wife's side-saddle to Hopewell church on the day of the killing. The defendant and Scott Hendricks went to Edom on Saturday, the day after the killing. Defendant did not own a gun at the time of the homicide, and if Scott had one the witness did not know it. Scott rode the side-saddle to the church for Esther Pruitt to ride back. He was going to ride defendant's saddle and mule back, and defendant was to go

to Tyler to see about a church bell. Defendant did not go to Tyler because Esther Pruitt could not go to his house.

Esther Pruitt testified, for the defense, that she saw the defendant and Scott Hendricks at the Hopewell church, on the day of the homicide. Witness had promised defendant's wife to visit her if she would send for her. Defendant on that day told witness that he had a mule and saddle for her, but witness's husband being sick, witness could not go to Kennedy's. It was in the evening when the witness saw the defendant at the church. She did not know how long he had then been there. She did not see the mule, and did not know as a fact that defendant brought one for her to ride back. She did not know whether defendant went from the church to Tyler, or whether he went back home.

William Kennedy, the father of the defendant, testified for the defense that the house in which he lived stood some seventy-five or one hundred yards from the house in which the defendant lived. Witness heard of Hill's death between 11 and 12 o'clock on the day he was killed. Frank Clemmons, who told him about it, reached his house between the hours named, and took dinner with him on that day. Witness saw Scott Hendricks three times on that day. He first came to witness's house about sunrise, bringing the witness's horses which had broken into his crop on the night before. He remained but a short time and left, going back towards his home. He returned between 8 and 9 o'clock and called to defendant, asking him if he was "ready." Defendant replied that he was not, as his mule had not yet got back. Scott went to the well, and witness, who was unwell, went into the house and did not notice his subsequent movements. At about 11 o'clock Scott again called to defendant, asking if he was ready. Defendant replied that he was, and he and Scott left together, going toward the Adrian crossing of the Neches river, which was in the direction of Hopewell church.

Cross-examined, witness said that Frank Clemmons lived beyond the Neches river, over the Adrian crossing. He ate dinner with witness on the day of the killing. Anthony Robinson was present, and Susan, defendant's wife, came to the house for medicine for her sick child, while Clemmons was in the house. She said nothing about a saddle. Witness told her of the death of Edmond Hill, but she asked no questions about it.

Susan Kennedy, the defendant's wife, testified in his behalf that she saw Clemmons at William Kennedy's house about 11 o'clock on the day of the homicide, and was then told of it. Defendant came home on the night before very much wearied, and slept late. He

was at home when Riley Turner got back from the mill, nor did he leave home until he and Scott Hendricks left to go to Hopewell church. Defendant rode his sorrel mule, and Scott defendant's black mule under a side-saddle which Esther Pruitt was to ride back. Defendant got home about dark, and was arrested late that night and taken to Edom by Mr. Raines.

Cross-examined, witness stated that defendant, Scott Hendricks, Henry Kennedy and Cassie Williams were to go to church together on that morning, but, the mule on which Riley Turner went to mill not getting back soon enough, Henry and Cassie did not wait for defendant and Scott. Defendant sent his ten-year-old son to tell Scott that he wanted to go to church on that day. Scott was to bring Esther Pruitt back, and defendant was to go to Tyler from the church, to see about the bell. None of witness's family went to deceased's house after the killing. The defense closed.

Frank Clemmons testified, for the State in rebuttal, that he reached William Kennedy's house between 11 and 12 o'clock on the day of the killing, told of the killing, and took dinner. Anthony Robinson was there. Susan, defendant's wife, came in and asked for a saddle to send for the cows. She said nothing that the witness heard about medicine. She got no saddle. Ike Runnells had not told, up to that time, that he recognized the voice of Scott Hendricks at the time of the killing.

Anthony Robinson testified, for the State, that he was at the house of William Kennedy when the defendant's wife came there on the day of the killing. She asked for a saddle for Riley Turner to ride after the cows. Susan said nothing about the killing when she was told of it.

Riley Turner, for the State in rebuttal, testified that he went to Green's mill on the morning of the killing, leaving defendant's house between daylight and sunrise. He passed Brown Perry's, and was riding the defendant's little black mule. He got back to defendant's from the mill between 9 and 10 o'clock. Defendant was then at home. Witness did not tell him that he had seen the deceased at the mill. Witness turned the mule loose after his return, and was directed by defendant to catch it again, which he did. He then saddled the sorrel and the black mule, but did not see them ridden off. Witness then performed some chores about the place and went fishing. Defendant got back late that night. The black mule came home through the field about the same time.

Willie Ann Williams testified, for the State, that defendant and Scott Hendricks reached Hopewell church about 3 o'clock in the evening on the day of the killing.

The motion for new trial raised the questions discussed in the opinion.

*H. B. Marsh, Burge & Russell* and *Kearby & McChesney,* for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

White, Presiding Judge. Appellant and one Iven Thompson and one Scott Hendricks were jointly indicted for the murder of one Edmond Hill, on the 17th day of August, 1883, in Van Zandt county. They were separately tried, and on his trial this appellant was convicted of murder of the first degree, the penalty assessed being a life term in the penitentiary. Nineteen bills of exception were saved to rulings made by the court at the trial, all of which appear in the record.

1. The precept or writ issued by the clerk with a copy of the special *venire* to be served on defendant had, if ever issued, been lost or mislaid. A copy of the *venire* had been served on the 17th day of April. On the day of trial, when it was ascertained that the precept or writ was mislaid or lost, defendant, though he did not deny that a precept or writ such as is required (Code Crim. Proc., art. 616) had been regularly issued, served, and returned on the 17th of April, simply excepted to a paper purporting to be said writ,— which paper the clerk and sheriff had of their own motion substituted in lien of the one lost, and he asked the court to hear proof as to the validity of this substituted paper. The explanation of the judge shows that he did hear the proofs, and from the evidence it appeared that the statutory writ had been issued with a certified copy of the special *venire,* and that it had been executed and returned on the 17th, the day the certified copy of the *venire* was delivered to defendant, and that it had been lost. Defendant did not deny that he had been served with a certified copy of the special *venire* on the 17th; he did not move the court to strike the pretended substitute from the files and that the prosecution be required to substitute the lost paper in the mode and manner required by law. (*Strong* v. *The State,* 18 Texas Ct. App., 19.) Had he done so, and the court had refused to grant the motion, there might then have been some question for us to determine. As it is, since the court appears to have complied with his request and done what he asked should be done, we cannot see that he has any further ground for complaint.

2. Amongst those exempt from jury service, when they may claim such exemption, are "all civil officers of this State and of the United States." (Rev. Stats., art. 3014, subdivision 2.) A postmaster is a civil officer of the United States. When the name of A. C. Clough was reached and called on the special *venire*, the sheriff stated that said juror was a postmaster; that he knew the fact, and that said juror had asked him to render this excuse for him. Whereupon the court excused the juror, and defendant excepted. Appellant's proposition in support of his exception is "that it is not competent for the court to excuse a juror selected and served as one of a special *venire*, until such juror has appeared at the trial, has been called and properly sworn to answer questions touching his service and qualifications, even though he may be exempt from jury service and the court apprised of the fact. His excuse, if any he has, must be established and claimed under oath." Ordinarily, this proposition is correct. (Code Crim. Proc., arts. 616, 619 and 620; *Robles* v. *The State*, 5 Texas Ct. App., 346; *Foster* v. *The State*, 8 Texas Ct. App., 254; *Hill* v. *The State*, 10 Texas Ct. App., 618; *Thuston* v. *The State*, 18 Texas Ct. App., 26.) But to this, as to every other general rule, there must, as there ought to be, exceptions where the rule should fail for the want of reason in its enforcement. A postmaster may be unable to leave his office without endangering the public service, even for a short time, just as one who is sick may be absolutely unable, from physical ailment, to appear and present in person his excuse. In either of such cases, we apprehend, he might send his excuse by another, and the court could hear and determine it in his absence. If defendant is not satisfied, or desires to disprove the fact or ground of excuse, he should apply for an attachment to have the juror brought forthwith into court. (Code Crim. Proc., art. 618, and *Thompson* v. *The State*, just decided, *ante*, p. 593.)

3. Bills of exception 3 and 7 show challenges for cause to the jurors on account of opinions previously formed. The jurors stated that such opinions would not influence their verdict, and that, notwithstanding such opinions, they could give the defendant a fair and impartial trial. As to the opinions of jurors the rule adopted by the Nineteenth Legislature is, "if it (the opinion) appears to have been formed from reading newspaper accounts, communications, statements or reports, or from mere rumor or hearsay, and the juror states on oath that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, the court, if satisfied that he is impartial and will render such verdict, may in its discre-

tion admit him as competent to serve in such case; but, if the court in its discretion is not satisfied that he is impartial, the juror shall be discharged." (Gen'l Laws Nineteenth Legislature, p. 91; art. 636, subdivis. 13.) Under the rule we cannot see that the court has abused its discretion in the two instances shown by the bills of exception. (See *Thompson* v. *The State*, decided at present term, *ante*, p. 593.)

4. As shown by the fourth bill, the juror Norman stated that he was a postmaster, and would have claimed exemption on that ground in this case had he known it. Defendant's counsel then asked him if he now desired to claim such exemption, to which question counsel for the State objected, and the court sustained the objection, and defendant exhausted a peremptory challenge upon said juror. As seen above, a claim of exemption for the ground stated is entirely a personal privilege, and unless the juror claimed the exemption he was not thereby disqualified, and it was not a right of defendant to urge or insist upon his claiming the exemption. We see no error in the ruling.

5. The juror Scott thought "a life sentence would be bad enough for anybody," and that he had conscientious scruples against the infliction of the death penalty. He was stood aside for cause by the State. This was correct. Thompson's case, just decided, disposes of the matter presented by the eighth bill, wherein the juror Cox stated he would not inflict the death penalty where he had the option of imposing imprisonment for life.

6. Bill of exceptions complains that the court would not delay the trial to enable defendant's counsel to prepare and write out his bills of exceptions. In his explanation to the bill the judge says defendant had five attorneys representing him on the trial, and one of them appeared to be engaged solely in writing out the bills of exception; wherefore he saw no necessity to delay the trial. A well settled rule of practice is that it is error to refuse a defendant time to prepare his bill of exceptions at the time the exception is reserved. (Rev. Stats., art. 1358; *Sager* v. *The State*, 11 Texas Ct. App., 110; *Knox* v. *The State*, 11 Texas Ct. App., 148.) And in *Brown* v. *The State*, 13 Texas Ct. App., 59, it is held that a. defendant on trial objecting to any order, ruling or decision of the trial court, is entitled to time in which to prepare his bill of exceptions, whether he has one or more counsel. But we do not think it was ever intended to hold that a mere refusal to grant time is reversible error whether defendant was injured or not by the refusal. For, though the time may not have been granted him, yet if he got his bill subsequently,

it cannot be perceived how he could claim that he was injured. In such case the ruling would amount simply to error without prejudice, which is rarely if ever held reversible error. In order to make an exception of this kind available, the exception should show that the refusal of time prevented defendant from preparing and getting the benefit of a bill to which he was entitled, or that some other material injury was thereby caused the defendant, and the bill of which he was deprived or the injury done should be shown in the bill of exceptions saved to the refusal to grant time. It has been held that the refusal of a district judge to sign a bill of exceptions which it is apparent could not have affected the result in the supreme court will afford no ground for reversal. (*Belo* v. *Wren*, 63 Texas, 668.) In this case the bill we are considering states no more than the bare fact that the court refused to grant time to prepare the bills, and does not state even in general terms that injury was occasioned, or any kind of prejudice to his rights suffered by appellant. As presented in the bill, we do not think a reversible error is shown. We will remark, however, that a court can never be too careful in refusing a defendant in a criminal case any right accorded him by law.

7. The ninth bill of exceptions shows that the juror Pirtle had qualified himself on his *voir dire*, and was accepted by the State, and the defendant having exhausted his peremptory challenges declined to accept or reject the juror, and the court ordered the juror sworn and impaneled. There was no error in this. If he could have done so, defendant should have challenged the juror for cause. Challenges for cause are never exhausted (*Loggins* v. *The State*, 12 Texas Ct. App., 65), even though his peremptory challenges may have been.

8. Bill of exceptions No. 10 was to the court's permitting the witness Runnells, over objection, to testify that just after the shooting of deceased he heard a voice (that of Scott Hendricks, a co-defendant) exclaim, "Oh, yes, boys, I got him this time." The evidence was admissible as *res gestœ*. (*Thompson* v. *The State*, just decided, *ante*, p. 593.)

9. Bill of exceptions No. 11 is in reference to the court's permitting counsel for the State to hold interviews with several of the witnesses who had at the beginning of the trial been placed under the rule. In explanation the court states that nothing occurred showing an abuse of the privilege. Such practice was condemned by this court in *Brown* v. *The State*, 3 Texas Ct. App., 294. The general rule is that all matters concerning the placing of witnesses

under the rule are confided to the discretion of the trial court, and that its action with reference to such matters will not be revised unless an abuse of discretion is manifest. (4 Texas Ct. App., 646; *Davis* v. *The State*, 6 Texas Ct. App., 196; 7 Texas Ct. App., 142; *Holt* v. *The State*, 9 Texas Ct. App., 572; 10 Texas Ct. App., 571; 11 Texas Ct. App., 32; 13 Texas Ct. App., 244; *Dubose* v. *The State*, 13 Texas Ct. App., 419; 14 Texas Ct. App., 1; 16 Texas Ct. App., 99.) No abuse of discretion has been made manifest in this instance.

10. Bill of exceptions No. 12 was saved to the question and answer propounded by the prosecution to the witness Hines, who stated that he had followed a mule track from the place of killing, and he was then asked by the State's counsel "if the mule that he, witness, had sold to one Willis Manley made the track he was tracking?" It was objected that the question was leading. A question is leading which suggests the answer desired. (*Tinsley* v. *Carey*, 26 Texas, 350.) The question put could have been answered either "yes" or "no," and we do not think either one of these answers was suggested more than the other. Another objection was that the question called for the mere opinion or conclusion of the witness. From the description the witness had given of his mule, and that she was reel-footed in her hind feet and made a most peculiar track, we think his testimony as to her tracks might well be called a fact which could be proven, in contradistinction to a mere opinion or a conclusion.

11. We can perceive no tangible reason why the evidence mentioned in the thirteenth bill of exceptions was not admissible. On the day of the killing, some one of the parties first reaching the place of homicide most sensibly tried to prevent others from obliterating the tracks leading to and from the place of the homicide, by instructing and requesting them to keep away. The witness testified to these efforts and instructions.

12. By the fourteenth bill it is shown that the court refused to permit the witness Wheat to testify to remarks made by one Jim Anderson to him when they heard the guns fire which were supposed to have killed Hill. These parties were in the woods, mauling rails, some distance away from the scene of the killing, and what they might have said to each other when they heard the firing was *res inter alios acta*, and inadmissible. The court did not err in excluding it.

13. The fifteenth bill of exceptions was reserved by defendant to the court's permitting Jack Williams to testify, over the objection of defendant, to certain statements made to the witness by Iven Thomp-

son (a co-defendant), some days before the killing, relative to the intentions of Thompson and appellant Kennedy to kill Edmond Hill,—appellant Kennedy not being present when Thompson made these statements to the witness. The evidence was admissible. The witness stated that Thompson said "that he and Tom Kennedy were going to kill Hill the first chance they got, and that they were going for him any time." A conspiracy between the parties may not have been conclusively established before this testimony was admitted, but it was established on the trial, and this testimony tended to establish its existence at the time the statements and declarations were made. (See the question elaborately discussed in *Cox* v. *The State*, 8 Texas Ct. App., 254.)

14. The sixteenth bill was to the action of the court in permitting Cauthorn, a justice of the peace, to testify that at and before the time of the killing there were causes pending on his docket between Edmond Hill's family and Tom Kennedy, defendant's family. The objection was that the docket was the best evidence. The witness could as a fact testify that such causes were pending, independently of his docket. ( See *Thompson* v. *The State*, just decided, *ante*, p. 593.)

15. The seventeenth bill of exceptions appears of record, and the same is not noticed or discussed in the brief of counsel for appellant.

16. The eighteenth and nineteenth bills of exception were saved to remarks made in argument by the attorneys prosecuting the case. From the eighteenth it appears that when the district attorney commenced to speak of "public opinion" the judge of his own motion stopped him, and told him "to refrain from any reference to public opinion, and nothing further was said by him about it." The objectionable remark made by the attorney employed to assist in the prosecution was that "from the testimony in the case he honestly believed defendant guilty." It was entirely proper for the court to interfere and stop the district attorney when he started out of the record to speak of public opinion. Public opinion has nothing to do with trials in a court of justice. The law is above public opinion,— independent of it,— cares nothing for it, and should always promptly condemn any attempt on its part to dictate or interfere in any manner with matters pending in her courts. The life and liberty of the citizen are not under the control of nor dependent upon public opinion. The law is the *ægis* of his protection against the mad demands of public opinion when life and liberty are at stake, and that law which could for a moment be swerved from its high purpose and prerogative by either the cries of popular clamor or popular

applause is but a fraud and a delusion, unworthy the name of law. Appreciating this, the learned judge, without suggestion from defendant's counsel, of his own motion promptly stopped the attorney so soon as he attempted to invoke public opinion. This was eminently proper. (*Crawford* v. *The State*, 15 Texas Ct. App., 503; *Cartwright* v. *The State*, 16 Texas Ct. App., 489; *Sterling* v. *The State*, 15 Texas Ct. App., 249; *Hunnicut* v. *The State*, 18 Texas Ct. App., 500.)

As to the expression made use of by the attorney aiding the prosecution, to the effect that he honestly believed defendant guilty, it was said by this court in the case of *Young* v. *The State*, at a former day of this term: "While it is true that authors treating upon this subject say that counsel, either for or against the prisoner, should never express their opinion as to the guilt or innocence of the accused, yet we would hesitate at this day to reverse a judgment because of a violation of this rule." (*Ante*, p. 536.) And besides, in this as in that case, counsel should have requested the court to instruct the jury that they should not be influenced by the attorney's individual opinion as to the defendant's guilt.

No exception was taken to the charge of the court to the jury, and no additional instructions were asked. The charge presents fully the law applicable to the facts proven.

As to the evidence, whilst it is circumstantial, it is, in our opinion, amply sufficient to sustain the verdict and judgment. Appellant appears to have had a fair trial, and he has been most ably defended in the lower court, and in this court has had his case thoroughly presented, both in oral argument and by brief of counsel. A mature consideration of the many intricate and interesting questions raised has led us to the conclusion that none of the errors complained of, if any there are, are of a character requiring that we should reverse the judgment. Appellant is shown by this record to have conspired with others to take the life of deceased, and that they consummated the conspiracy with a most foul assassination. The judgment is affirmed.

*Affirmed.*

[Opinion delivered December 16, 1885.]